UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHARON CREEL,

      Plaintiff,

v.                                                         Case No. 8:07-cv-248-T-24 MAP

WACHOVIA CORPORATION,

      Defendant.
_____/

## ORDER

This cause comes before the Court on Defendant's motion for summary judgment (Doc. No. 14), Plaintiff's opposition thereto (Doc. No. 15), and Defendant's reply brief (Doc. No. 21). As explained below, Defendant's motion is granted.

**I.  Summary Judgment Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

**II. Background**

      Plaintiff Sharon Creel filed this suit seeking long-term disability ("LTD") benefits under Defendant's LTD Plan, which is governed by ERISA. Defendant is the sponsor of the LTD Plan and pays benefits under the LTD Plan. The LTD Plan is administered by Defendant's Benefits Committee (made up of officers of Defendant), and the Benefits Committee has delegated to Human Resources the responsibility to administer and interpret the plan. (WAC 1517[1]). The plan grants the plan administrator discretionary authority. (WAC 1464). Liberty Life Assurance Company of Boston ("Liberty Mutual") is the third party claims administrator. (WAC 1517).

      Plaintiff is a fifty-six year old woman. She is a former employee of Defendant who worked as a Group Product Manager until July 15, 2002, when she was hospitalized for an attack, in which she complained of chest pain and partial paralysis of one side of her body. Plaintiff applied for short-term disability ("STD") benefits, and she received STD benefits for the maximum period under the STD plan (26 weeks). At that time, her primary care physician stated that Plaintiff's primary diagnosis was major depression, with a secondary diagnosis of anxiety and migraine headaches. (WAC 1406-07).

      Thereafter, Plaintiff submitted a claim for LTD benefits. (WAC 1346–49). In support of her claim, Plaintiff's primary care physician submitted an attending physician statement, in which he gave a primary diagnosis of major depression and secondary diagnosis of migraine headaches. (WAC 1301-02). Defendant approved her LTD claim, effective January 13, 2003.

      The LTD Plan defines "disabled" as follows:

    (a)      during the Elimination Period and the next 24 months, the Participant's

---

[1] Citations to the administrative record (which is contained at Doc. No. 14) are given by referencing the bates stamp number of the document being cited.

2

>> inability to perform all of the material and substantial duties of his or her own occupation on an Active Employment basis because of an Injury or Sickness; and
>
> (b) after the period described in paragraph (a) above, the Participant's inability to perform all of the material and substantial duties of his or her own or any other occupation for which he or she is or becomes reasonably fitted by training, education, and experience because of an Injury or Sickness.

(WAC 1440).

The LTD plan contains a limitation for mental illness. The limitation states: "The benefit for Disability due to Mental Illness or Chemical Dependency will not exceed 24 months of Disability Benefit payments unless the Participant" is in a hospital or becomes confined for treatment. (WAC 1457). The LTD Plan defines "mental illness" as "mental, nervous, or emotional diseases or disorders of any type." (WAC 1442).

The LTD Plan requires the claimant to provide proof of his or her disability, and the LTD Plan defines proof as:

> (a) the evidence in support of a claim for benefits in a form or format satisfactory to the Claims Administrator, (b) an attending Physician's statement in a form or format satisfactory to the Claims Administrator, completed and verified by the Participant's attending Physician, and (c) provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence that may be required by the Claims Administrator in support of a claim for benefits.

(WAC 1461).

On January 12, 2005, Liberty Mutual sent Plaintiff a letter stating that since she had received LTD benefits for twenty-four months, she had to show that she was unable to perform any occupation (rather than just unable to perform her own occupation) in order to continue to receive LTD benefits under the terms of the LTD Plan. (WAC 1146). Liberty Mutual requested

that Plaintiff provide office visit notes from Dr. Afield (psychiatrist) and Dr. Griffin (neurologist) from November 2004 forward. (WAC 1146). It also asked that she submit a headache diary indicating when she had a headache over a thirty day period. (WAC 1146). The letter informed her that she would continue to receive LTD benefits while Liberty Mutual was gathering information in order to evaluate her eligibility for continued LTD benefits. (WAC 1146).

Plaintiff submitted the requested headache diary. In the diary, Plaintiff indicated that she had migraines on eleven days and that she thought that they were triggered by the weather. (Doc. No. 14, p.5; WAC 1140-41, 144-45).

Liberty Mutual requested an outside vendor to assign an independent physician consultant ("IPC") neurologist to review Plaintiff's file and to determine whether Plaintiff's claim could fall outside of the twenty-four month limitation for mental illness. The IPC, Dr. Patrick Parcells, reviewed the information on file and stated the following in his March 29, 2005 report:

> Reportedly since [July of 2002], she had multiple migraines every month. They would last days until they improve.
> \*   \*   \*
> [In March of 2004] . . . Dr Griffin's evaluation stated that Ms. Creel had spells of up to eight times per month. Spells consisted of sudden onset of severe headache pain with left hemiplegia.[2] . . . These spells would last 20 minutes to one day.
> \*   \*   \*
> Ms. Creel underwent a number of studies on March 26, 2004 including MRl of the brain as well as MRA of the Circle of Willis, which were normal. She had noninvasive carotid studies on 3/16/04 that were normal. She had a cardiac echocardiogram on 3/16/04 that was normal and an EEG on 3/26/04 that was normal. . . It should be noted that during Dr. Griffin's visits, findings were consistent including a decrease in sensation, left face in the V1-V3 distributions. She had decreased nasolabial fold on the left side. There was always noted a mild

---

[2]Hemiplegia is paralysis of one side of the body.

left pronator drift. There was diminution of light touch and pinprick on the left hemibody.  These physical findings are persistent in all of Dr. Griffin's visits. However, Dr. Griffin felt that even though the studies were normal that this likely represented a right brain lacunar infarction.

\*     \*     \*

[In October of 2004, Dr. Griffin] . . . noted that she had been on multiple medications for her headaches[, and] . . . that her headaches at that time were caused by weather changes.  Neurological exam again was unchanged.

\*     \*     \*

Throughout multiple neurological visits, the headaches are described as chronic frequent headaches.  There is a headache diary that states Ms. Creel had a headache on [11 days] . . ..  Ms. Creel reports the headaches as severe. Unfortunately, there is not a specific description of the headaches' location, type, or triggers other than weather. Ms. Creel's treating physician, Dr. Griffin has suspected lacunar infarctions of the right brain based on her history of left-sided weakness and left-sided findings.  However, her MRI, which is a very sensitive test for lacunar infarctions, did not show this.

Ms. Creel's impairments relate predominantly to a combination of fatigue, headache, and depression. There are very mild subtle neurological findings listed by Dr. Griffin but these would not interfere with her functioning.  Ms. Creel's limitations are mostly based on what appears to be depression and anxiety, which has culminated in chronic headaches that do not fulfill the International Headache Society classification for migraines, and certainly may be musculoskeletal, tension, and stress related by history.  Records suggest her symptoms to be multifactorial. The only safety issue would be for her not to be around extremes of weather changes or heights.

\*     \*     \*

[R]ecords suggest that most of her impairment is based on depression, anxiety, and subsequent musculoskeletal headaches.  There was no prior history of headaches noted prior to the episode that occurred in July 2002. This would be somewhat unusual for these to be truly vascular/migraines, plus there is no evidence to support any objective abnormal neurological studies.

\*     \*     \*

Ms. Creel's self-reported physical limitations are not substantiated. Her symptoms appear to be related to complaints of chronic pain and headache which as above appear to be more related to depression, stress, and anxiety rather than a true physical abnormality.

\*     \*     \*

From a physical standpoint, Ms. Creel is capable of working.  This reviewer does not find any information to suggest that the headaches are incapacitating and that they are caused by an organic process, but rather that they are related to depression and anxiety; headaches can certainly be . . . [an effect] of depression and anxiety.  Although Dr. Griffin's physical examination suggests some findings

> noted on the left side of the body suggesting a right brain process, this has not
> been documented by objective neurological testing including MRI, MRA, EEG
> and echocardiography as well as extensive blood work.
>
> Thus overall, Ms. Creel has subjective complaints of frequent headaches that
> subjectively are incapacitating. However, there is not objective information
> available on laboratory testing or by history that these headaches are an organic
> process, but rather by history would be most consistent with depression, stress,
> and anxiety. Therefore the headaches are not physically incapacitating, nor
> should they be considered the main cause for any inability to work.

(WAC 1132-35).

Thereafter, on April 28, 2005, Liberty Mutual sent Plaintiff a letter informing her that it was terminating her LTD benefits. Liberty Mutual cited the IPC's report and his conclusions contained therein. Liberty Mutual concluded that "[t]he medical information currently on file does not support the presence of a physical condition that would prevent you from performing any occupation . . .." (WAC 445-47).

On October 17, 2005, Plaintiff appealed the termination of her LTD benefits, arguing that her migraine headaches are disabling and that they do not fall within the mental illness limitation provision of the LTD plan. (WAC 366-67). In support of her appeal, Plaintiff submitted additional medical records, including progress notes from Dr. Afield.

In his February 15, 2005 progress note, Afield states that Plaintiff's migraines "evidently are so debilitating that at times she loses sight and inability to move her left arm." (WAC 387). On September 21, 2005, Plaintiff underwent a nuerobehavioral assessment, and Afield concluded that the results showed that Plaintiff was severely depressed. (WAC 376-77). In his September 23, 2005 progress note, Afield states:

> I reviewed all the neurodiagnostic testing and this lady's medical records. I think
> it confirms our own clinical findings. The lady is moving towards the dementia.
> I think we will test her periodically, but things do not look good. Again, this is a
> purely physical situation that is disabling her.

6

(WAC 373).

Plaintiff also submitted the opinion of Dr. Robert Martinez, a neurologist. (WAC 930-35). His May 25, 2006 report indicated a diagnosis of "[a]typical migraine syndrome with left sided paralysis - incapacitating 10 days out of the month." (WAC 934). He stated that he believed that for ten days out of the month, Plaintiff is unable to work and that when those ten days will occur is unpredictable. (WAC 935).

Liberty Mutual submitted Plaintiff's entire file to another IPC, Dr. J. Leslie Kurt, a psychiatrist. In Kurt's June 29, 2006 report, Kurt stated:

> Available medical documentation does not reasonably support . . . cognitive deficits of sufficient severity to result in the medical necessity for restrictions and limitations from 4/27/05 to the present time.
>
> Available medical documentation reasonably supports a diagnosis of recurrent headache with onset in July of 2002 associated with positive findings of cervical spasm and occipital nerve tenderness. Though it is unclear if the claimant is experiencing hemiplegic migraines, multiple neurologists and a pain specialist have diagnosed the claimant with migraine headaches. She has also been diagnosed with musculoskeletal headache and bilateral occipital neuralgia. Further evaluation by a consulting neurologist of recently provided medical documentation may be considered in order to determine if medical impairments are reasonably supported.
>
> The claimant has seen multiple physicians and has undergone extensive diagnostic assessment and neurologic consultation in order to clarify the differential diagnosis and the etiology of her complaints of (1) cognitive impairment (2) new onset migraine with frequently reported hemiplegic component and (3) possible TIAs [transient ischemic attacks[3]] and to clarify if the claimant suffered a lacunar infarct in July of 2002. Extensive diagnostic imaging and laboratory studies have been negative. It is also noteworthy, that the claimant has not been observed by any of her treating physicians during an episode of

---

[3]A transient ischemic attack ("TIA") is referred to by some people as a mini-stroke, because the symptoms are similar to a stroke but do not last as long. A TIA occurs when blood flow to part of the brain is blocked or reduced.

7

>hemiplegic migraine, despite the reported frequency of these events (up to 10 episodes per month). Nonetheless, even if one assumes that the claimant suffers from hemiplegic migraine, the clinical course of this rare migraine variant is not characterized by cognitive deterioration. Available neurological and psychiatric documentation, at most, reflects minimal observed cognitive deficits. These consist of episodic, very mild word finding problems associated with excellent comprehension and other cognitive functioning. These intermittent mild impairments are of insufficient severity to result in the medical necessity for restrictions and limitations. Based on a comprehensive review of the file, these cognitive deficits are most likely secondary to depression and anxiety.

(WAC 191-92).

Based on Kurt's recommendation that Plaintiff's file be reviewed by a neurologist, Liberty Mutual had another IPC, Dr. Choon Rim, a neurologist, review Plaintiff's file. In his July 19, 2006 report, Rim stated:

>There are reports of MRI and MRA of the brain and carotid arteries performed on March 16, 2004, and they were normal.
>
>. . . Dr. Robert Martinez' office was called . . [and on July 13, 2006 Martinez] stated that he saw this lady only once, and she is under the care of Dr. Maria Wilson for the management of her headaches. He feels that she had atypical complicated migraine with a headache and the left-sided weakness, but he agreed that there may be some medication overuse headache in addition. He thinks that the neurological examination was normal. Nonetheless, he believed that the headaches come about 10 days out of the month, during which she is completely disabled, but the rest of the days, it should be OK for her to work. He admits that her anxiety and depression may affect her headache problems, and he was not able to state the prognosis for the headache control.
>
>Dr. Walter Afield's office was called three times in an attempt to discuss this case[, but] . . . he never returned the call[s].
>
>\*      \*      \*
>
>Initially, Dr. Griffin's examination showed some findings on the left side especially involving the trigeminal nerve on the left side and the sensory function on the left side with a slight nasal labial flattening. However, all subsequent examinations by numerous different neurologists showed no abnormalities or evidence of neurological deficit. Based upon reviewing the available medical evidence, the differential diagnosis should include TIA, especially for the first attacks dating back to July 13, 2002; however, the subsequent numerous attacks cannot be explained on the basis of TIA without proceeding into a complete

> stroke and they cannot be explained on a neurological basis in that subsequent neurological investigations have been normal. There is no evidence that Ms. Creel ever suffered a stroke. Her findings of normal EEG rule out the possibility of partial seizures. This is also supported by the fact that in between her "attacks" she has been doing well. There is the possibility of hemiplegic migraines or complicated migraine; however, based upon her history, this rare condition is not supported by the available medical evidence since hemiplegia migraines usually occur in childhood and they cease to produce attacks in adulthood. Furthermore, there is no family history of similar problems and as discussed above hemiplegic migraines are a rather rare disorder. Based upon her history of depression, anxiety, panic attacks, and chronic fatigue syndrome, her "attacks" were clinical manifestations, including that of psychiatric or psychogenic in nature. As discussed above, subsequent to 2002, her neurological examinations have been normal. Subsequent to the 2002 time frame, there is no neurological explanation for any further ongoing neurological impairment resulting in physical restrictions or limitations. Based upon Ms. Creel's history, and in the absence of any neurological deficit noted by numerous neurological specialists, her symptoms appear to be clinical manifestations being psychiatric or psychogenic in nature. As such, from a neurological standpoint, in the absence of any neurological abnormalities as discussed above there is no identifiable neurological impairment that could translate to restrictions.
>
> In my discussion with Dr. Martinez, []he states that while Ms. Creel is not with a headache, she is able to function "quite well." However, her complaints of headaches and "attacks" are not supported from a neurological perspective in that there is no evidence of neurological deficit or abnormality subsequent to the time frame of 2002 that can account for any neurological abnormality.
>
> \* \* \*
>
> [B]ased solely on a neurological basis, no abnormality is identified neurologically which could account for any impairment requiring restrictions or limitations. As Ms. Creel's conditions appear to be clinical manifestations being psychogenic or psychiatric in nature, further comment in this regard falls outside my area of expertise. In general, patients with migraine headaches would be excused from the workplace. However, the available evidence does not support that in the case of Ms. Creel.

(WAC 827-829).

By letter dated July 25, 2006, Liberty Mutual notified Plaintiff that it had completed the review of her request for reconsideration of the termination of her LTD benefits, but the decision to terminate her LTD benefits remained unchanged. (WAC 831-35). Specifically, Liberty

9

Mutual stated that based on the totality of information contained in Plaintiff's file, there was not "support of a physical impairment that would prevent her from performing any occupation." (WAC 834).

Thereafter, on September 20, 2006, Plaintiff appealed the decision to Defendant's Benefits Committee. (WAC 801-02). Plaintiff attached an opinion from Dr. Martinez, dated September 7, 2006. The September 2006 opinion of Martinez is very similar to his May 25, 2006 opinion that Plaintiff previously submitted. In his September opinion, Martinez states that Plaintiff's symptoms remain extremely severe and that when she is experiencing a migraine, her symptoms can last from four hours to a couple of days. (WAC 805). He further states that she is unable to work. (WAC 805). He concludes his report by stating:

> Based on the combination of her symptoms, my review of medical records, and the fact that these headaches are unpredictable and incapacitate her for 10 days out of the month, in my opinion this patient is unable to be gainfully employed. In my opinion, she is 100% permanently, totally disabled, unable to work, function, or compete in a competitive job environment due to the combination of her problems. This is based on my examination of the patient and my review of medical records.

(WAC 808).

On December 21, 2006, Defendant's Benefits Committee sent Plaintiff a letter affirming Liberty Mutual's decision to terminate her LTD benefits. (WAC 782-84). The Committee cited Rim's conclusion that "no abnormality is identified neurologically which could account for any impairment requiring restrictions or limitations." (WAC 783). The Committee further noted that "[n]o new medical documentation has been submitted which would controvert the previous decisions." (WAC 783). As such, the Committee concluded:

> The limitations of benefits for Mental Health and Chemical Dependency have been met. In the absence of documentation supporting a physical impairment that

> meets the definition of Disability or Disabled under the provisions of the plan the Committee is unable to alter the previous decisions. Therefore, the appeal must be denied.

(WAC 783). Thereafter, Plaintiff filed the instant lawsuit.

### III. ERISA Standard of Review

When a court reviews a denial of an ERISA-plan benefit, the court follows the following steps:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Williams v. Bellsouth, 373 F.3d 1132, 1137-38 (11th Cir. 2004)(footnotes and citations omitted).

When there is a conflict of interest, the court employs a two-step, burden-shifting approach:

> (1) The claimant shows that the administrator of a discretion-vesting plan is conflicted.
> (2) The administrator then proves that his plan interpretation was not tainted by self-interest.
>
> A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the claimant. But, if the administrator can demonstrate a routine practice or give other plausible justifications-such as benefitting the interests of other beneficiaries-judicial deference to it may be granted, since [e]ven a conflicted

11

> [administrator] should receive deference when [he] demonstrates that [he] is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries.

Id. at 1138 (footnotes, quotation marks, and citations omitted); see also Doyle v. Liberty Life Assurance Co. of Boston, 511 F.3d 1336, 1342-44 (11th Cir. 2008). However, even if "the administrator satisfies this burden, the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious." HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 995 (11th Cir. 2001)(citation omitted).

**IV. Motion for Summary Judgment**

Defendant moves for summary judgment, arguing that its decision to terminate Plaintiff's LTD benefits was not wrong, and even if it was wrong, it should be upheld because it was reasonable. The Court agrees.

Based on the facts and the language of the Plan, the Court finds that Defendant's decision to terminate Plaintiff's benefits was not *de novo* wrong. While it could be argued that Defendant's decision was unfair, because it is almost impossible to have objective medical evidence that substantiates the severity of her migraines and her subjective complaints[4], the terms of the Plan require that Plaintiff submit evidence in support of her claim for disability benefits in a ***form satisfactory to Defendant*** and that Defendant could require ***objective medical evidence***. (WAC 1461).

Plaintiff asserts three arguments as to why Defendant's decision was wrong: (1) she

---

[4]Arguably, objective evidence of the severity of her migraines might be obtainable if one of her doctors saw her during one of her migraines and witnessed the partial paralysis.

should not have been required to submit objective medical evidence of her disability; (2) the mental illness limitation in the Plan is ambiguous; and (3) she was not provided with a full and fair review of her final appeal. Accordingly, the Court will address each argument.

### A. Objective Medical Evidence

Plaintiff argues that Defendant cannot require objective medical evidence of her disability, because her disability is an inherently subjective condition. In support of this argument, Plaintiff cites <u>Oliver v. Coca Cola Co.</u>, 497 F.3d 1181 (11th Cir. 2007). Plaintiff's reliance on <u>Oliver</u> is misplaced.

In <u>Oliver</u>, the terms of the plan provided that in order to receive disability benefits, the claimant must submit "'a medical certification of his Disability.'" <u>Id.</u> at 1195. The plan did not state that the administrator could require objective medical evidence in order to qualify for disability benefits. <u>See id.</u> at 1196. Therefore, the court found that it was arbitrary and capricious for the administrator to deny the claimant's claim for disability benefits based on a lack of objective evidence. <u>See id.</u>

Conversely, in the instant case, the Plan does state that the administrator could require the claimant to submit objective medical evidence in support of her claim for disability benefits. (WAC 1461). As such, while Defendant's decision may have been unfair, it was not wrong under the terms of the Plan.[5] As explained by one court, it is not this Court's function to

---

[5]For example, one court has interpreted the <u>Oliver</u> decision as follows:
<u>Oliver</u> did not create a broadly applicable rule requiring disability plan administrators to credit, in every case, a claimant's subjective complaints of pain. The <u>Oliver</u> Court simply found that in the context of the plaintiff's diagnosis and medical records, and under the terms of the plan at issue in that case, the administrator's decision to deny benefits because of a lack of "objective medical evidence" was arbitrary and capricious.
<u>Tippitt v. Reliance Standard Life Ins. Co.</u>, 2007 WL 4054664, at *7 (N. D. Ga. Nov. 7, 2007).

13

determine if the terms of a plan are fair:

> Plaintiff asserts she should be exempted from the requirement of producing "objective medical evidence" of disability [fibromyalgia], because her condition is not readily susceptible to objective identification or documentation. The court recognizes that a fibromyalgia sufferer will not always be able to present objective evidence to support all of her symptoms, and that resulting difficulties may sometimes arise in the pursuit of disability benefits. Nonetheless, plaintiff has presented no authority that would allow the court to disregard a plan term requiring objective medical evidence whenever a claimant suffers from a condition which does not readily lend itself to objective identification. The court's task is to determine whether it was "wrong" for [the administrator] to determine that plaintiff is not disabled *under the plan.* It is not for the court to determine whether the plan is fair to plaintiff as written, or to rewrite a plan term if it creates an obstacle for plaintiff in marshaling evidence to support her claim.

Ecklund v. Continental Casualty Co., 415 F. Supp.2d 1353, 1372 (N.D. Ala. 2005).

While Plaintiff's doctors believed that Plaintiff was unable to work ten days out of the month and that those ten days were unpredictable, it was not wrong for Defendant to credit the opinions of the IPCs that reviewed Plaintiff's medical records over the opinions of Plaintiff's doctors. See Helms v. General Dynamics Corp., 222 Fed. Appx. 821, 833 (11th Cir. 2007)(stating that if the administrator was dissatisfied with the evidence of disability that the participant provided, it could submit the participant's medical file for peer review and could discount the participant's doctor's opinion in favor of a contrary opinion produced by the peer review). The Supreme Court has stated:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

In the instant case, the opinions of the IPCs supported Defendant's decision to terminate

Plaintiff's benefits. Dr Parcells stated that Plaintiff's "self-reported physical limitations are not substantiated" and that "[f]rom a physical standpoint, [she] is capable of working." (WAC 1134-35). Parcells concluded that he did "not find any information to suggest that the headaches are incapacitating." (WAC 1135). Likewise, Dr. Rim concluded that while in general, people with migraines would be excused from work, "the available evidence does not support that in the case of Ms. Creel." (WAC 829). Additionally, Dr. Kurt noted that Plaintiff had not been observed by any of her doctors during an episode of a migraine, despite the reported frequency of their occurrences. (WAC 191-92). Accordingly, Defendant's decision is supported by the IPCs' conclusions and is not wrong.

### B. Mental Illness Limitation

Plaintiff also argues that Defendant's decision was wrong, because it terminated her benefits pursuant to the ambiguous mental illness limitation of the Plan. Specifically, Plaintiff cites Billings v. Unum Life Ins. Co. of America, 459 F.3d 1088 (11th Cir. 2006), and argues that the mental illness limitation is ambiguous, because it does not specify whether an illness is categorized as mental based on its symptoms or cause. Plaintiff further argues that because the mental illness limitation is ambiguous, it must be construed against Defendant, and therefore, even if her headaches are caused by depression, they cannot be considered to be part of a mental illness subject to the mental illness limitation under the Plan.

The Court agrees with Plaintiff that even though the IPCs concluded that her headaches were caused by her depression, the mental illness limitation does not necessarily bar her disability claim. The flaw in Plaintiff's argument, however, is that Defendant's decision to terminate her LTD benefits was not based on its conclusion that her headaches were caused by

her depression; rather, its decision was based on the IPCs' conclusions that there was no objective evidence that her headaches caused her to be unable to work. Therefore, given the lack of objective medical evidence that her headaches caused her to be unable to work, Defendant found that her claim was barred based on the mental illness limitation, because her depression and anxiety could not be the basis of her claim for continued benefits.

### C. Full and Fair Review

Plaintiff's final argument is that Defendant did not provide her with a full and fair review of her final appeal in accordance with 29 C.F.R. § 2560.503-1(h). Specifically, Plaintiff argues that Defendant did not appropriately consider the additional September 7, 2006 report of Dr. Martinez that she submitted with her final appeal.

Defendant responds that Dr. Martinez's September report was substantially similar to his May 25, 2006 report. Both reports state that Martinez believes that Plaintiff is suffering from atypical migraines with left-sided paralysis that cause her to be incapacitated and unable to work ten days out of the month. (WAC 805-08; WAC 930-35). As such, Defendant argues that it was not wrong for failing to have its IPCs review the September report in connection with Plaintiff's final appeal, since the May and September reports were substantially similar. Furthermore, Defendant points out that one of the IPCs (Dr. Rim) actually spoke with Martinez on July 13, 2006 (less than two months before Martinez issued the September 7, 2006 report) in connection with Plaintiff's prior appeal.

The Court finds that it was not wrong for Defendant to fail to submit Martinez's September report to the IPCs for review. Accordingly, the Court finds that there is no genuine issue of material fact regarding whether Plaintiff was given a full and fair review of her final

appeal.

### D.  Conflict of Interest

As explained above, the Court finds that Defendant's decision to terminate Plaintiff's LTD benefits was not wrong.  However, even if its decision was wrong, the Court finds that Defendant's decision was reasonable, based on the facts and the terms of the Plan.  See Wangenstein v. Equifax, Inc., 191 Fed. Appx. 905, 913-14 (11th Cir. 2006)(stating that it was not unreasonable for the administrator to require objective evidence of the claimant's disability due to migraines, since the plan gave the administrator discretion to determine what was adequate proof of a continuing disability).

Since the Plan granted Defendant discretion, the arbitrary and capricious standard of review applies in some form.  Furthermore, Defendant operated under a conflict of interest, since Defendant pays the benefits under the Plan.  Given the conflict of interest, the heightened arbitrary and capricious standard of review applies.

Under the heightened standard, the burden is on Defendant to show that its decision to terminate Plaintiff's LTD benefits was not tainted by self-interest.  Defendant argues that it has shown that its decision was not tainted by self-interest, because requiring objective evidence of a disability benefits all of the participants of the Plan by ensuring that only legitimate claims are paid, thus maximizing assets available to pay legitimate claims.

The Court agrees with Defendant and finds that it has purged itself of its conflict of interest.  Therefore, even if Defendant's decision to terminate Plaintiff's benefits was wrong, it was a reasonable decision that will be upheld by this Court.

**V.  Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that Defendant's motion for summary judgment (Doc. No. 14) is **GRANTED**.   The Clerk is directed to enter judgment in favor of Defendant and to close the case.

**DONE AND ORDERED** at Tampa, Florida, this 25th day of February, 2008.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record